IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ALEXIS TURNER,<br><br>                      Petitioner,<br><br>      vs.<br><br>M. ELIOT SPEARMAN, Warden, High Desert State Prison,[1]<br><br>                      Respondent. | No. 2:15-cv-02019-JKS<br><br>MEMORANDUM DECISION |

       Robert Alexis Turner, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Turner is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at High Desert State Prison. Respondent has answered, and Turner has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

       On September 16, 2010, Turner was charged, along with co-defendants Allen John Periman and Valerie Nessler, with the first-degree murder of Jeffrey Wheatley (Count 1) and causing great bodily injury (Count 2). The information further alleged as to Turner that, in the commission of the murder, he intentionally and personally discharged a shotgun that proximately caused great bodily injury or death. It likewise alleged as special circumstances that Turner committed the murder while committing arson and that the murder was intentional and involved the infliction of torture. On May 13, 2011, the co-defendants proceeded to a jury trial. The trial court subsequently granted the prosecutor's request to sever the trial of co-defendant Periman

---

      [1] M. Eliot Spearman is substituted for Ron Barnes as Warden, High Desert State Prison. FED. R. CIV. P. 25(d).

and ordered separate juries for Turner and co-defendant Nessler.  On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Turner and the evidence presented at trial:

> The following evidence was presented to both juries, unless otherwise stated.
>
> Nessler shared a Stockton residence with the victim, Jeffrey Wheatley, and witness Drew Pyeatt.  They all used drugs, and the victim sold methamphetamine from the house.  Turner was Nessler's friend and sometimes joined the residents with his friend, Allen "AJ" Periman (whose trial was severed and whose second-degree-murder conviction we affirmed in a separate appeal (*People v. Periman* (Aug. 13, 2014, C071812) [nonpub. opn.]).  Turner had been in the garage, where Pyeatt kept gasoline.
>
> In March 2010, the victim bragged to Nessler about having killed someone in 1994.  Nessler told Turner, who probed for details and said it sounded like the circumstances surrounding the death of his own brother, William "Moose" Phillips, who had been shot in 1994.  Pyeatt testified he "heard the talk around the house" about it.
>
> On the afternoon of April 6, 2010, Nessler warned Pyeatt it was not safe for him to be in the house.  Turner phoned and told Pyeatt things were going to happen, and if Pyeatt said anything, he and his parents would be killed.  Pyeatt warned the victim, who thought he could talk his way out of the potential danger.  Pyeatt left.  Nessler suggested she was going to leave the house also but instead stayed behind.
>
> Pyeatt returned home around 11:30 p.m., saw flames, and called 911.  The fire was to an area around a corpse in the entryway, later identified as Wheatley.
>
> The city's fire investigator was of the opinion the fire was intentionally set.
>
> On April 6, 2010 at about 11:15 p.m., Officer Nick Sareeram of the Lodi Police Department stopped a black Honda Accord in Lodi.  He turned on his spotlight and he then saw a person riding in the front passenger seat get out of the car and run away.  He could only describe him as a male wearing a white shirt and khaki pants.  Officer Sareeram went to the Honda and found that Allen Periman was driving the car and Valerie Nessler was seated in the middle of the rear seat.  When Officer Sareeram searched the area of the right front passenger seat he found a glass smoking pipe.
>
> The medical examiner who performed the autopsy of Wheatley testified the victim suffered shotgun wounds to his head, face, and trunk; blunt force trauma to his head, face, and trunk; more than 30 stab wounds to his head, face, neck, and trunk; and thermal burns to 100 percent of his body.  Each form of trauma included injury of lethal capacity, but none of the injuries were instantaneously fatal.  The medical examiner believed the victim was shot first, began bleeding, then sustained the blunt force trauma and stab wounds at about the same time, and then was set on fire.  The victim was still alive when he was set on fire.  The medical examiner opined the victim suffered mentally and physically "the highest levels of pain a human being could experience."
>
> A criminalist testified the blood trail showed the attack started in the home's utility room; the victim then moved through the kitchen to the entryway, where he fell.

2

Different blood drop patterns in other rooms suggested a different person had cut themselves and walked through the house. Police found a plastic bag in the entryway, containing two bent bloody knives, clothes, and other items. DNA testing of the blood on the blades was consistent with the victim's profile, and blood on one handle was consistent with Turner's profile. Blood samples from the hallway and the wall near the garage door were consistent with Turner's DNA profile. DNA testing on a pair of latex gloves found in a bedroom excluded Turner, but a swab from inside one glove was consistent with Nessler's DNA, and a bloodstain on the other glove was consistent with the victim's DNA.

Only Nessler's jury heard evidence of statements she made when questioned by the police. She initially denied knowing anything about the crimes but then, in a third interview, admitted she was involved but said she participated out of fear that Turner and Periman would kill her if she did not.

Turner turned himself in on April 17, 2010. The tip of his right middle finger was cut but healing. It was consistent with being about two weeks old and with stabbing a hard surface with a knife, causing the hand to slide down the blade.

Only Turner's jury heard evidence of a recorded jailhouse conversation between Turner and friend Trisha Rivera. [Turner] said, "I didn't kill him. I didn't. I shot him, but I didn't kill him. I, I mean, that's just being real. I didn't. He was still alive when that bitch set him on fire." Turner said it would be his word against hers. Turner also said, with apparent reference to his cut finger, "It's healed now, see it? I can't feel it. Dead . . . . Super-glued it back on . . . . [I]t was just hanging like this. Like, this, my nail could touch this . . . . It got caught on fire . . . . [I]t fuckin' came back and caught the whole thing on fire, stuck to my hand." He said he told the "psych," "you ever had fuckin' brain matter all over your face? Have you ever tasted someone else's brains?" Turner also said the police knew his body bore the victim's DNA because it showed up on tests, even though Turner had bleached everything.

Nessler's friend, Gregg Way, testified in front of Turner's jury only. He visited Nessler in jail. He did not know Turner. Nessler told Way that Turner wanted Way to visit and put money on Turner's "books" in jail. Way did not visit Turner but put $110 on his books. Way never discussed putting $5,000 on Turner's books.

A corrections officer testified before both juries that she overheard a conversation between Turner and Nessler in holding cells waiting to go to the courtroom. Turner asked if Nessler had read "it." She said, "I haven't even read it yet." [Turner] said, "You need to read it. You need to read it to him over the phone. And then you need to destroy it because it's hot." A deputy heard the exchange and asked Nessler to turn "it" over. Nessler said she did not have it, she left it on the bus. The officer threatened to tell the judge. Nessler smirked, put her hand down her pants, and produced a handwritten note ("kite"). As the female corrections officer walked away, she heard Turner say "fucking bitch" but did not know if he meant her or Nessler.

The note, which was read only to Turner's jury, not Nessler's jury, said:

"Gregg, I wish we could have met on different terms, but it is what it is. Thank you for what you've done for me so far. Let me get to the point of this. I'm going to need you to take care of me, Gregg, if I'm going to get on the stand and take this whole

beef. I love Val. She's my little sis. But by taking this, my chance of an appeal is gone. Can you understand that? You are not obligated to take me up on this. I am only suggesting that if I'm going to willingly spend the rest of my life in prison, and get Val off, I need to know I'm going to be taken care of. I'm a man of my word, Bro, always have been. Look, Gregg, I'm going to need a gesture to know we on [sic] the same page. I'm not asking you to break yourself. That is not what I'm saying. I'm only saying that I am not going to walk into this life sentence with nothing to show for it. I do understand—I do understand you do feel likewise, but this is my life we're talking about. Put enough on my books to get me through Tracy. I will then give you my mom's info so we can stay in touch. Five grand will get me through the next few years. I'll take the stand and do everything to get Val home. The five is to start my journey. Now that I've laid it out to you, the next move is yours. My word is my bond. I know you do not know me, but my word is bond. This ain't personal. It's business. I love you for loving Val. Thank you for what you did for Chloe [deceased daughter of Nessler]."

Turner did not testify at trial.

Nessler testified in front of both juries. She testified she warned the victim to get out of the house. Before she could leave, Turner kicked in the front door, carrying a shotgun, followed by Periman, who told her not to leave. She was scared. She heard two gunshots and the sounds of a struggle coming from the kitchen. Periman told Turner that Nessler would "snitch." Turner grabbed a knife from the kitchen, stabbed the victim multiple times, then gave the knife to Nessler and told her to stab the victim. She was afraid. She took the knife and pretended to stab the victim. She denied wearing gloves. Turner ran to the garage, returned with a gasoline can, poured gasoline on the victim, and then hit the victim on the head with the gas can and with what appeared to be the butt of the shotgun. Turner told Nessler to get a match and set fire to the victim. She refused. At Turner's command, she grabbed the garbage bag for his clothes, and two lighters fell out when she dumped the garbage from the bag. Turner lit the victim on fire. Nessler tried to run, but Turner forced her into a car, and Periman drove them away. She did not alert the police officer who stopped the car because she was afraid. During transport from jail to the courthouse for trial, someone other than Turner passed her a note, but she did not get a chance to read it before it was confiscated. She planned to give it to her lawyer. She denied that she was cooperating with Turner.

*People v. Turner*, Nos. C069089, C069380, 2015 WL 351659, at *1-3 (Cal. Ct. App. Jan. 28, 2015).

At the conclusion of trial, Turner's jury found him guilty of first-degree murder as charged in Count 1 and found true the allegation that he personally discharged a firearm causing great bodily injury or death in the commission of that offense. The jury also found true that

Turner committed the murder while committing the crime of arson and that he intentionally committed the murder and it involved the infliction of torture. The jury additionally found Turner guilty of arson as alleged in Count 2.² The trial court sentenced Turner to a term of life imprisonment without the possibility of parole ("LWOP") for the first-degree murder conviction and related special circumstances. The court also imposed a term of 25 years to life imprisonment for the gun enhancement. The trial court stayed sentencing on the arson conviction pursuant to California Penal Code § 654.³

Through counsel, Turner appealed his conviction, arguing that: 1) the trial court erred in failing to instruct the jury on the requirement of corroboration of an accomplice as to the special circumstances; 2) there was insufficient evidence to corroborate Nessler as to the arson count or as to the separate crimes underlying the special circumstances; 3) the foregoing accomplice corroboration errors violated Turner's right to due process; 4) the imposition of a restitution fine was improperly imposed because it was based on judicially-determined facts; and 5) the trial court erred in imposing and suspending a parole restitution fine where LWOP sentence was imposed. On January 28, 2015, the Court of Appeal issued a reasoned, unpublished decision striking the parole restitution fine but otherwise unanimously affirming the judgment against Turner in all other respects. Turner petitioned for review in the California Supreme Court, which was summarily denied on April 15, 2015.

---

² Nessler's jury found her guilty of first-degree murder and arson and found true that she personally used a knife in the commission of the murder.

³ Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

Turner timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on September 20, 2015. *See* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Turner raises three grounds for relief. First, he argues that the trial court erred in failing to instruct the jury as to the requirement of corroboration of Nessler's testimony as to the special circumstances. He similarly contends that there was insufficient evidence to corroborate the accomplice testimony of Nessler. Finally, Turner claims that the errors related to accomplice corroboration violated his right to due process.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

Turner raises three claims that relate to the requirement under California law that accomplice testimony be sufficiently corroborated by other evidence to support a criminal conviction. CAL. PENAL CODE § 1111. However, the United States Supreme Court has held that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." *Caminetti v. United States*, 242 U.S. 470, 495 (1917); *see United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face."). "When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions." *United States v. Augenblick*, 393 U.S. 348, 352 (1969). Therefore, the requirement of California Penal Code § 1111 that "'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right" and cannot be the basis of federal habeas relief. *Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010).

As the Ninth Circuit has explained, California's statutory law prohibiting convictions based solely on uncorroborated accomplice testimony is only a state law rule: it is not required by Constitution or federal law. *See Laboa v. Calderdon*, 224 F.3d 972, 979 (9th Cir. 2000). Thus, because Turner's claims are grounded in the state law requirement that accomplice testimony be corroborated, he can show no constitutional violation based on the alleged inadequate corroboration (Ground 2) or the failure to give a corroboration instruction (Ground 1). *See United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible

or unsubstantial on its face."); *Takacs v. Engle*, 768 F.2d 122, 127 (6th Cir. 1985) ("If uncorroborated accomplice testimony is sufficient to support a conviction under the Constitution, there can be no constitutional right to instruct the jury that it must find corroboration for an accomplice's testimony."); *see also United States v. Fritts*, 505 F.2d 168, 169 (9th Cir. 1974) (holding on direct review that trial court's failure *sua sponte* to give cautionary instruction on accomplice testimony did not warrant reversal).

Moreover, Turner fails to establish a due process violation here (Ground 3) because he may not transform his state instructional error and insufficiency of the evidence claims into a federal claim by simply asserting a violation of his constitutional rights. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted). The Court notes, however, that a federal constitutional issue may arise if a prisoner can show an arbitrary deprivation of a "state law entitlement" such as a procedural rule addressing specific evidence like accomplice corroboration. *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Turner did not advance any type of *Laboa-Hicks* claim on direct appeal or in this Court. Nor could he. The state court reasonably—and non-arbitrarily—concluded that there was sufficient evidence to corroborate Nessler's testimony and that Turner was not prejudiced by the trial court's failure to give a specific instruction on corroboration for the arson special circumstance. *Turner*, 2015 WL 351659, at *5.

Construing Turner's *pro se* Petition liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), the Court may discern that it raises a claim that the evidence is insufficient to prove guilt beyond a reasonable doubt because the accomplice's testimony is incredible or insubstantial. A criminal conviction cannot rely solely on an accomplice's uncorroborated statement that is "incredible or insubstantial on its face." *Laboa*, 224 F.3d at 979 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) (analyzing sufficiency of evidence of conviction)).

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

11

For the same reasons persuasively articulated by the Court of Appeal in finding that there was sufficient independent evidence to convict Turner of arson and to find true the special circumstances of arson and torture, there was more than ample evidence to satisfy the requirements of *Jackson* with respect to those convictions. Turner is thus not entitled to relief on his claims in any event.

## V. CONCLUSION AND ORDER

Turner is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* F<small>ED</small>. R. A<small>PP</small>. P. 22(b); 9<small>TH</small> C<small>IR</small>. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: October 12, 2017.

                                                     /s/James K. Singleton, Jr.
                                                     JAMES K. SINGLETON, JR.
                                                     Senior United States District Judge